IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GEORGE BRASWELL                                                                    PLAINTIFF

v.                                    CASE NO. 5:14-CV-05387

WASHINGTON COUNTY, ARKANSAS;
MARILYN EDWARDS; DONNIE COLEMAN;
WILLIAM REED; JEFF CROWDER;
DAN SHORT; SHAWN SHRUM; and
HAYDEN WAGNON                                                                  DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

Currently before the Court are Defendants' Motion for Summary Judgment (Doc. 26) and Plaintiff's Motion for Leave to File Second Amended Complaint (Doc. 33). The parties have fully briefed these motions, and they are now ripe for decision. For the reasons discussed herein, the Court **GRANTS** Plaintiff's Motion for Leave, and **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment.

## I.      BACKGROUND

The Court recites the facts in the light most favorable to Braswell, the non-moving party, as it must. *See Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). At all times relevant to this case, Plaintiff George Braswell was a Heavy Equipment Operator ("HEO") for the Washington County Road Department (the "Road Department") in Washington County, Arkansas. The Defendants, aside from the County itself, were all officials and employees of the County: Marilyn Edwards was the County Judge—a position that is not judicial in nature, but is more akin to being the CEO for the County; Dan Short was Edwards' Chief of Staff; Donnie Coleman was the Superintendent of the Road Department; Shawn Shrum was the Assistant Superintendent of the Road

1

Department; William Reed was the Bridge Supervisor within the Road Department; Jeff Crowder was the Right-of-Way and Asphalt Supervisor within the Road Department; and finally, Hayden Wagnon was the Bridge Crew Lead Man within the Road Department (collectively, "Individual Defendants"). Each of the Individual Defendants had supervisory authority over Braswell in one way or another.

The Road Department is responsible for the construction and maintenance of Washington County's roads and bridges. Braswell was assigned to the tile crew, which was responsible for re-sealing roads, filing in pot holes, and executing other duties to maintain the County's roads. In the fall of 2013 the tile crew was assigned to help out with the construction of the Harvey Dowell Bridge. While on site, Braswell noticed and reported that the Road Department was not constructing the bridge in what, from his experience, was a proper fashion. In short, and in layman's terms, the Road Department was incorrectly installing certain steel rebar support rods and concrete footings. Braswell felt that this potentially compromised the bridge's structural integrity.  On October 3, 2013, Braswell reported his concerns to Edwards and Short in a face-to-face meeting.

About a year later, in the fall of 2014, the tile crew was sent to assist with the construction of a bridge on County Road 64, called the Stonewall Road Bridge. Braswell observed construction issues similar to what he had seen at the Harvey Dowell Bridge, and after viewing the engineer's specifications, realized that the Road Department was deviating from them. This time, he voiced his concerns to Coleman, Reed, Wagnon, and Crowder.[1] Braswell also had safety concerns related to the excavation stage of the

---

[1] As it turned out, Braswell was right about both bridges. The County has since torn down the structure at the Stonewall Bridge site, and has had to reinforce the Harvey Dowell Bridge.

bridge's construction. In short, he was concerned that the Road Department was not utilizing sloping techniques or wall braces to prevent earthen walls from collapsing in on workers. Braswell anonymously reported his excavation-related safety concerns to Arkansas Occupational Safety and Health ("AOSH") on October 7, 2014. AOSH later visited the construction site and ordered the Road Department to remedy the problem.

On October 9, 2014, Coleman and Crowder met with Braswell to discuss his concerns. They, in essence, told him to "keep [his] mouth shut," and that the construction of bridges was "above [his] pay grade." (Doc. 28-1, p. 45). They also inquired into whether he was the person who anonymously called AOSH. Braswell denied that he was because Coleman and Crowder seemed to be "very, very agitated . . . ." (Doc. 28-1, p. 47). They told Braswell to stop "stirring the pot," falsely accused him of performing poorly on the job and "playing around" on the job, and told him they would find out who made the AOSH report. (Doc. 38-1, p. 2).

Braswell published letters to the editor in the Madison County Record on October 16, 2014 and on November 6, 2014.[2] The letters alerted readers to the construction issues with both of the bridges, and lamented the budget shortfalls that caused the Road Department to—in his eyes—inadequately maintain County roads. An unknown person or persons posted the letters to the door of the Road Department's breakroom and on the window of a supervisor's office. Braswell took these postings as a silent warning to him, to "shut up and keep [his] mouth shut." (Doc. 28-1, p. 49).

---

[2] In addition to his letters to the editor, Braswell wrote a letter on November 24, 2014 addressed to the Washington County Quorum Court and to Edwards explaining the deficiencies in the bridges.

3

Around the same time, on November 7, 2014, Braswell received a negative job evaluation from Crowder. (Doc. 38-1, Ex. A-1). The evaluation marked Braswell as needing improvement in the areas of "initiative / attitude," "cooperation / loyalty," and "communication / public contact." *Id.* "Needs Improvement" is the lowest ranking an employee can get. In all other areas, Crowder marked Braswell as meeting his job requirements, a ranking in the middle of the evaluation's five-point scale. In the comments section, Crowder wrote that Braswell needed to improve his attitude, improve his support towards superiors, refrain from inserting himself into matters above his pay grade, and just accept duties as assigned and accomplish his tasks. *Id.*[3]

On December 3, 2014, Braswell was transferred from the tile crew to the bridge crew, a move that he considered to be in retaliation for speaking out about the bridges and other safety concerns. (Doc. 28-1, pp. 58-60). Moreover, the bridge crew is seen within the Road Department as being "the last stop" before termination. (Doc. 38-3, p. 18). He characterized the environment while working on the bridge crew as "hostile" and one of "intimidation." *Id.* at 59. Specifically, Reed told Braswell that he was going to "come after [him]" if he got him fired, and then later clarified that he meant he'd come after him legally. *Id.* at 62-63. Braswell's co-workers on the bridge crew made a series of other disparaging remarks, including statements insinuating that they had gotten other employees to quit. *Id.* at 63. These remarks, and other incidents,[4] went unpunished or

---

[3] In contrast, Braswell characterizes his prior year's evaluation as "positive." (Doc. 28-1, p. 49).

[4] Braswell alleges a number of other specific instances of possibly retaliatory conduct that are not described in detail here. For example, he alleges that Short asked one of Braswell's co-workers to falsify an accident report to implicate Braswell, but Braswell was never punished for the accident. He also alleges that Coleman slammed a pad of paper

largely unpunished. Although Braswell's transfer to the bridge crew was classified as "permanent" by Coleman, Doc. 38-3, p. 19, Braswell was transferred back to the tile crew shortly after he filed the instant suit on December 19, 2014.[5]

In addition, Braswell alleges that he was passed over for promotions for which he was as qualified or more qualified than the successful applicant. Namely, Braswell has been passed over for multiple HEO-2 positions, and for the position of Assistant Road Superintendent.

Finally, Braswell was a supporter of Edwards' 2014 opponent for County Judge, Jeff Williams. He contends that his support for Williams was a contributing factor used to his detriment in all of the above incidents.

Braswell filed an Amended Complaint on June 24, 2015. The Amended Complaint raises claims under the First Amendment and § 1983, the Arkansas Civil Rights Act ("ACRA"), the Arkansas Whistle-Blower Act ("AWA"), and a state law claim for the tort of outrage. Defendants filed a Motion for Summary Judgment (Doc. 26) on January 22, 2016, contending that Braswell's First Amended Complaint failed to name the Individual Defendants in their individual capacities, leaving only official capacity claims for the Court to decide. Alternatively, the Motion argues that Braswell has failed to show that he has suffered an adverse employment action, as is required to succeed on his First Amendment, ACRA, and AWA claims, and that his outrage claim fails as a matter of Arkansas law. On February 5, 2016, Braswell filed a Motion for Leave to File Second

---

and a pen down in front of him and sarcastically exclaimed that he wanted to make sure Braswell had the supplies to write more letters to the editor.

[5] Moreover, Braswell was moved back to the tile crew *because* he filed the instant lawsuit. (Doc. 38-4, p. 143 (Coleman Dep.)).

Amended Complaint (Doc. 33) to address the individual capacity issue. Six days later, Braswell filed his Response to Defendants' Motion for Summary Judgment, countering: (i) that his amended complaint did name the Individual Defendants in their individual capacities; (ii) that alternatively, the Court should grant his Motion for Leave to correct the issue; (iii) that he has suffered an adverse employment action; and (iv) that his outrage claim should be allowed to proceed under Arkansas law. Defendants filed a Reply on February 23, 2016 (Doc. 39), making both Motions ripe for decision as of that date.

## II.   SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical inferences that can be drawn from the facts. *Union Elec. Co.*, 135 F.3d at 1212-13. The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential

element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

### III.    DISCUSSION

### A.  Braswell's Motion for Leave

When Braswell filed his initial Complaint on December 19, 2014, the case caption listed each Individual Defendant "individually and in [their] official capacit[ies]." (Doc. 1, p. 1). When he filed his Amended Complaint on June 24, 2015, however, Braswell unintentionally omitted that phrase from the caption. Rule 15(a)(2) of the Federal Rules of Civil Procedure allows parties to amend their pleadings "with the opposing party's written consent or the court's leave." Rule 15(a)(2) further instructs that courts "should freely give leave when justice so requires."[6]

This is such a case. Refusing to grant Braswell leave to amend his Complaint would, in effect, extinguish his claims against all of the Individual Defendants. The Court will not impose such a harsh penalty on a plaintiff for what amounts to a clerical error committed by his attorney. Defendants, on the other hand, insist that granting Braswell leave to amend his Complaint will result in unfair prejudice against them. This argument is unavailing. The amendment would cause no need for additional discovery, nor would it affect the scheduled trial date. Moreover, the Court believes that the body of the Amended

---

[6] Defendants suggest that Braswell's Motion for Leave is more properly analyzed under the rubric of Rule 16(b)(4) because the time for amending the pleadings set forth in the Court's Rule 16 Scheduling Order (Doc. 20) has passed. Rule 16(b)(4) requires a showing of "good cause" to modify a scheduling order. This difference of opinion between the parties is one that the Court does not need to resolve, as Braswell would be granted leave under either standard.

Complaint gives the Individual Defendants sufficient notice regarding Braswell's intention to bring individual-capacity suits against them; they are far from blindsided by such claims. *E.g.*, Doc. 17, ¶¶ 59, 66 (requesting "punitive damages against individual Defendants"). Finally, that the parties are at a relatively late stage of litigation is of no help to Defendants. The Eighth Circuit has recognized that it would not be an abuse of discretion for a district court to allow a plaintiff to amend its complaint to add individual capacity claims even after an appeal. *See Murphy v. State of Arkansas*, 127 F.3d 750, 755 (8th Cir. 1997); *Nix v. Norman*, 879 F.2d 429, 433 n.3 (8th Cir. 1989). Thus, Braswell's Motion for Leave is **GRANTED**.[7]

### B.  Summary Judgment: Qualified Immunity

The Individual Defendants next contend that they are entitled to summary judgment based on their qualified immunity. The qualified immunity doctrine protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Consistent with *Harlow*, the Supreme Court has developed a two-part test to evaluate qualified immunity claims: (1) whether the facts that a plaintiff has shown make out a violation of a

---

[7] The district court in *Murphy* essentially took the opposite approach to reach the same result as the Court now does. In *Murphy*, the district court found that the plaintiff's complaint was sufficiently clear to notify the defendants that they were being sued in their individual capacities, and thus found it unnecessary to rule on the plaintiff's motion for leave to amend. The Eighth Circuit disagreed with the district court about the clarity of the complaint, but assumed that the lower court would have granted the plaintiff leave to amend had it adjudicated the motion, and proceeded to the merits with that assumption in mind. *Murphy* thus provides sounder grounds for this Court to resolve the instant issue by granting Braswell's Motion for Leave, rather than addressing the sufficiency of his Amended Complaint.

constitutional right; and (2) whether the constitutional right was clearly established at the time of the defendant's alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Stepnes v. Ritschel*, 663 F.3d 952, 960 (8th Cir. 2011). The Court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first . . . ." *Pearson*, 555 U.S. at 236.

### 1. Braswell Has Shown a Violation of a First Amendment Right

To establish a *prima facie* case of retaliation under the First Amendment, Braswell must show: (1) that he engaged in constitutionally protected activity;[8] (2) that Defendants took an adverse employment action against him; and (3) that his protected activity was a substantial or motivating factor in the adverse employment action. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977);[9] *Duffy v. McPhillips*, 276 F.3d

---

[8] Defendants do not challenge whether Braswell's speech was constitutionally protected, which obviates the need for the Court to address that issue. *Cf. Hemminghaus v. Missouri*, 756 F.3d 1100, 1110-1113 (8th Cir. 2014) (applying the *Pickering* test to determine whether public employee's speech was constitutionally protected).

[9] Defendants contend that *University of Texas Medical Center v. Nassar*, a recent Title VII case, replaces the *Mt. Healthy* "substantial or motivating factor" test with a "but-for" test. 133 S. Ct. 2517 (2013). *Nassar* held that in Title VII retaliation cases, a plaintiff must show that "his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 2534. With little analysis, the Fifth Circuit and the Eastern District of Arkansas have both found that *Nassar* does not apply to First Amendment retaliation cases. *See Mooney v. Lafayette Cnty. Sch. Dist.*, 538 Fed. App'x. 447, 453 n.4 (5th Cir. 2013); *Stoner v. Ark. Dep't of Correction*, 983 F. Supp. 2d 1074, 1099 (E.D. Ark. 2013) (citing *Mooney*). A Southern District of New York court has, however, cited *Nassar* with approval in the First Amendment context—albeit also without analysis. *Mazur v. New York City Dep't of Educ.*, 53 F. Supp. 3d 616, 638 (S.D.N.Y. 2014).

The Court believes that the Fifth Circuit and the Eastern District of Arkansas have it right: *Nassar's* holding is premised on complex statutory interpretation unique to Congress's framing of Title VII retaliation claims and the overall structure of Title VII. Ultimately, however, this is a question the Court need not definitively decide. Defendants hardly address causation in their Brief, and the evidence of the causal link between Braswell's

988, 991 (8th Cir. 2002). Defendants focus their Motion for Summary Judgment on the second prong, arguing that Braswell has failed to show that he suffered an adverse employment action. The Court disagrees.

In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme Court held that an employee must demonstrate that "a reasonable employee would have found the challenged action materially adverse" to prove retaliation. *Id.* at 67. This supplanted the Eighth Circuit's prior, more restrictive approach, which dictated that only "tangible changes in duties or working conditions that constituted a material employment disadvantage" could be adverse employment actions. *AuBuchon v. Geithner*, 743 F.3d 638, 642 (8th Cir. 2014) (quoting *Manning v. Metro. Life Ins. Co., Inc.*, 127 F.3d 686, 692 (8th Cir. 1997)). Although *Burlington Northern* arose in the context of Title VII, *see* 548 U.S. at 61-64, the Eighth Circuit has recognized that it applies full force to First Amendment retaliation claims. *See Delgado-O'Neil v. City of Minneapolis*, 435 F. App'x 582, 584 (8th Cir. 2011) (unpublished) ("[Plaintiff's] First Amendment retaliation claims are analyzed under the same framework as claims of retaliation under Title VII, a standard visited by the Supreme Court in *Burlington Northern.*"); *Shockency v. Ramsey Cty.*, 2006 WL 1974431, at *5 (D. Minn. July 13, 2006) *reversed in part on other grounds by* 493 F.3d 941 (8th Cir. 2007) (citing *Burlington Northern* in the First Amendment context for the proposition that "reassignment to less prestigious or desirable duties may constitute an adverse employment action"); *Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011) ("First Amendment retaliation claims are analyzed under

---

protected activities and his adverse employment actions is sufficient to satisfy even the more stringent "but-for" rule. *See infra* n.14.

the same framework as claims of retaliation under Title VII."); *see also Thomas v. Cty. Of Riverside*, 763 F.3d 1167, 1169 (9th Cir. 2014); *Lore v. City of Syracuse*, 670 F.3d 127, 163 (2d Cir. 2012); *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cty.*, 587 F.3d 1223, 1237-38 (10th Cir. 2009) (all applying *Burlington Northern* in the First Amendment context).

The Court finds that the instant case involves questions of material fact as to whether Braswell suffered an adverse employment action.[10] First, the Court believes that a reasonable jury could conclude that Braswell's assignment to the bridge crew was an adverse employment action. Both Braswell and Brad Robbins—the current Supervisor and former Lead Man of the Road Department's tile and asphalt crew—both felt that Braswell's transfer to the bridge crew was a form of punishment. *See* Doc. 28-1, p. 58 (Braswell Dep.) ("[E]verybody knew that if you got moved to the bridge crew, they moved you to get rid of you."); Doc. 38-3, p. 18 (Robbins Dep.) (stating that move to the bridge crew was a form of punishment because "the saying's always 'that's the last stop'"); *id.* at p. 30 (stating that he thought Braswell's assignment to the bridge crew was retaliatory); *id.* at p. 58 (stating that he told Coleman that the bridge crew already didn't like Braswell). Braswell has, moreover, presented evidence that his treatment on the bridge crew was consistent with a punitive intent. *E.g.*, Doc 28-1, pp. 59-63 (reciting incidents involving Wagnon, Reed, and other employees while on the bridge crew). This evidence shows that a reasonable employee would have viewed the transfer as materially adverse, 548 U.S. at 67, and distinguishes the instant case from others in which the Eighth Circuit (pre-

---

[10] The Court, moreover, concludes that this would be the case even under the Eighth Circuit's pre-*Burlington Northern* conception of an adverse employment action.

*Burlington Northern*) held that transfers were not adverse employment actions. *See Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 853-54 (8th Cir. 2000); *Hoffman v. Rubin*, 193 F.3d 959, 964 (8th Cir. 1999).

Second, the Court finds that a reasonable jury could conclude that the Road Department's failure to promote Braswell to HEO-2 or Assistant Road Superintendent was an adverse employment action.[11] "Unquestionably, failure to promote can constitute

---

[11] As somewhat of an aside, Defendants assert in a footnote that the Court should not consider the County's failure to promote Braswell to Assistant Road Superintendent because it occurred after the filing of Braswell's Amended Complaint. Defendants cite no case law to support this proposition, and the Court's search revealed none directly on point either. Ultimately, the Court finds it appropriate to consider the County's failure to hire despite the fact that it occurred after Braswell's Amended Complaint was filed. As an initial matter, the Court notes that the Federal Rules of Civil Procedure contain a mechanism for supplementing a pleading with transactions, occurrences, or events that happen after the date of the pleading. *See* Fed. R. Civ. P. 15(d). Rule 15(d) is most commonly used to supplement a pleading with post-complaint facts that correct a jurisdictional flaw, *Wilson v. Westinghouse Elec. Corp.*, 838 F.2d 286, 290 (8th Cir. 1988), or allow a plaintiff to add a new cause of action, *Keith v. Volpe*, 858 F.2d 467, 473-75 (9th Cir. 1988). In any event, the Court has granted Braswell's Motion for Leave to amend his Complaint, and so the events in question will have occurred prior to the filing of his Second Amended Complaint. This likely obviates the prudential or procedural necessity of a 15(d) motion—though the issue not having been briefed, the Court expresses no definitive conclusion on the matter.

Regardless of the appropriateness of a 15(d) motion, the Court finds that considering the events in question at this summary judgment stage does not unfairly prejudice Defendants, and is entirely appropriate for reasons of judicial economy. The interview process and qualifications of the successful candidate for the position were discussed during deposition testimony in the discovery phase of this case, and multiple defendants were involved in the hiring process. Defendants were thus aware that Braswell applied for the position and was unsuccessful in obtaining it. Rule 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a). This liberal pleading standard does not require a plaintiff to offer every fact in support of his claim in his complaint. Rather, the standard contemplates that supporting facts will often be developed through discovery. Given the purpose of Rule 8(a), the impending filing of a Second Amended Complaint, and the Defendants' undisputed notice of the events in question, the Court finds it well within its discretion to consider the County's failure to promote Braswell in adjudicating this Motion. The Court lastly notes that this does not affect the ultimate outcome of the Motion, as

12

an adverse employment action that would support a plaintiff's retaliation claim. In fact, a failure-to-promote claim has satisfied this court's stricter, pre-*Burlington Northern* standard." *AuBuchon*, 743 F.3d at 643 (internal citation omitted). "Where a plaintiff's retaliation claim is based upon not receiving a promotion, plaintiff bears the burden of proving that the person who received the promotion was similarly or equally qualified." *Brown v. Mo. State Highway Patrol*, 56. F. App'x 282, 285 (8th Cir. 2005) (unpublished); *accord Shannon v. Ford Motor Co.*, 72 F.3d 678, 682 (8th Cir. 1996) (listing the elements necessary to prove a *prima facie* race discrimination claim based on failure to promote, including that similarly situated employees were promoted instead).

Braswell was hired by the Road Department in May of 2013. (Doc. 28-1, p. 9). Prior to that he was self-employed as a heavy equipment operator for 12 years, and had maintained similar employment for his entire adult life. *Id.* Viewing the facts in the light most favorable to Braswell, other employees similarly (or, perhaps, less) qualified were promoted to HEO-2 in shorter time spans: "Travis Reed was promoted from HEO-1 to HEO-2 almost immediately after his start date. Vance Reed, his cousin, was promoted to HEO-2 in less than 12 months. It is well known that Vance and Travis are close friends of Donnie Colman [sic]." (Doc. 38-2, ¶ 9). Former Department employee Clay Stephens was promoted to HEO-2 in less than two years and had "just as much experience" as Braswell. (Doc. 38-4, p. 70).

Braswell also interviewed for the Assistant Road Superintendent position in December of 2015, after he filed his Amended Complaint. He has shown that the person

---

Braswell's transfer to the bridge crew was sufficient to constitute an adverse employment action.

who eventually got the position—Brad Phillips—was similarly (or less) qualified. Phillips had been with the Road Department for only about six months—about two years less that Braswell. (Doc. 38-7, p. 146). Coleman, who played a role in the hiring process, stated that he preferred Phillips for the position over Braswell because of Phillips' computer skills. (Doc. 38-4, p. 60). However, the relevance of computer skills to the position is a question of material fact, as Coleman testified that he had no computer skills during his ten years as Superintendent for the Road Department. *Id.* at 64.

Third, the Court finds that a reasonable jury could conclude that Braswell's negative job evaluation was an adverse employment action. While "[a] poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment," an unfavorable evaluation may become actionable "where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions" of employment. *Spears*, 210 F.3d at 854. Subsequent to Braswell's negative employee evaluation, he was passed over for two positions for which similarly qualified applicants were eventually hired . This raises a question of material fact as to whether his negative evaluation was used "to detrimentally alter the terms or conditions" of his employment. *Id.*; *see also Gagnon v. Sprint Corp.*, 284 F.3d 839, 851 (8th Cir. 2002) (stating that a written reminder resulting "in the outright closing of job openings . . . and the loss of opportunity to compete for any position . . . might support a claim of retaliation"), *abrogated on other grounds by* 539 U.S. 90 (2003).[12]

---

[12] Short and Edwards have both submitted affidavits stating that they first learned of Braswell's negative evaluation when they received the initial Complaint in this case. *See* Docs. 28-2, 28-3. Braswell's candidacy for the Assistant Road Superintendent came after this case was first initiated. This means that both Short and Edwards were aware of the negative evaluation during the hiring process for that position.

Finally, the Court finds that a reasonable jury could conclude that Braswell suffered an adverse employment action by looking to the cumulative effect of the Road Department's actions. *See Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 787-88 (8th Cir. 2007) *abrogated on other grounds by* 643 F.3d 1031 (8th Cir. 2011); *Phillips v. Collings*, 256 F.3d 843, 849 (8th Cir. 2001); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997). On top of the three individual adverse employment actions outlined above, the record is riddled with incidents between Braswell and his co-workers or supervisors. For example, when Braswell requested time off to go to the dentist, Crowder crumpled up his written request and threw it back at him.[13] (Doc. 28-1, pp. 50-56). On another occasion, after Braswell had penned his letters to the editor, Coleman slammed a pad and pen down in front of Braswell while he was sitting at a table and exclaimed that "if you have a hankering to write some more, I'm just making sure you have plenty of supplies." *Id.* at 57. On multiple occasions while working on the bridge crew, Braswell was the subject of taunts and threats. *See generally id.* pp. 58-63. In making this finding, the Court is cognizant that it is "well-settled in this circuit that ostracism and rudeness by supervisors and co-workers do not rise to the level of an adverse employment action." *Gagnon*, 284 F.3d at 850. However, Eighth Circuit case law suggests only that "ostracism . . . cannot, *without more*, be the foundation for a retaliation claim." *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 969 (8th Cir. 1999) (emphasis added). When combined with the tangible adverse employment actions discussed *supra*, a reasonable jury could find that

---

[13] Braswell was eventually granted the time off.

these acts of disrespect and ostracism combined with the bridge crew transfer, failure to promote, and/or negative evaluation constitute an adverse employment action. [14]

### 2. Braswell's Right was Clearly Established

The question pertinent to the "clearly established" prong of the qualified immunity analysis is whether the law clearly established that the actions taken by the Individual Defendants "had employment consequences serious enough to amount to adverse employment actions." *Shockency*, 493 F.3d at 950. Even under the Eighth Circuit's pre-*Burlington Northern* conception of adverse employment actions, it was clearly established that a transfer involving "a significant change in working conditions" was an adverse employment action. *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 (8th Cir. 2000). This included a transfer to a "less prestigious unit"—which, viewing the facts in the light most favorable to Braswell, the bridge crew was. *Id.* at 920. It was also clearly established

---

[14] It is unclear to the Court whether Defendants' request for summary judgment is at all based on the third (causation) prong of the First Amendment retaliation test. Other than a footnoted argument about the proper legal standard to employ for the third prong, Defendants' Brief focuses entirely on the adverse employment action issue. Assuming, but not deciding, that Defendants' footnote about the third prong is sufficient to raise that issue on summary judgment, the Court finds ample evidence on the record to conclude that Braswell's protected activity was a substantial or motivating factor (or a but-for cause, *see supra* n.9) of the Defendants' adverse employment actions.

First, temporally, some of the adverse actions occurred close to Braswell's letters and complaints about the bridges and safety concerns. *See Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 675 (8th Cir. 2006) ("Temporal proximity rises in significance the closer the adverse activity occurs to the protected activity.") (alteration omitted) (quoting *E.E.O.C. v. Kohler*, 335 F.3d 766, 774 (8th Cir. 2003)). Second, the negative evaluation specifically chastises Braswell for "inserting [his] own opinion" and "inserting himself into matters that are above his pay grade," both clear references to Braswell's protected speech. (Doc. 38-1, at p. 8). Third, Defendants' Brief fails to suggest any neutral reasons for their actions. *See Duffy v. McPhillips*, 276 F.3d 988, 991 (8th Cir. 2002) ("Once the employee satisfies his initial burden, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for his or her actions.").

that a failure to promote over an equally qualified employee, 743 F.3d at 643, and a negative evaluation subsequently used to detrimentally alter the terms or conditions of employment, 210 F.3d at 854, were adverse employment actions. Given this, the Court has little difficulty in concluding that, post-*Burlington Northern*, the Individual Defendants' actions were clearly established to be adverse employment actions. This includes, moreover, the conduct of the Individual Defendants viewed cumulatively and in context. *Kim*, 123 F.3d at 1060; *Devin*, 491 F.3d at 788.

In sum, Braswell has presented sufficient evidence that he suffered a clearly established adverse employment action. For that reason, the Individual Defendants are not entitled to qualified immunity on his First Amendment retaliation claim.

### 3.  Braswell's First Amendment Prior Restraint Claim

Braswell's Amended Complaint separately identified two First Amendment claims: one based on retaliation, and one based on prior restraint. Defendants moved for summary judgment on both claims. While retaliation is punishment for speech that has already occurred, the First Amendment also "protects speakers from threats of punishment that are designed to discourage future protected speech." *Bartlett v. Rock Twp. Ambulance Dist.*, 2012 WL 1309371, at *5 (E.D. Mo. Apr. 17, 2012). Such threats of punishment are prior restraints. In the context of a public employer punishing an employee for past speech, however, the distinction between retaliation and prior restraint becomes blurred. Indeed, as Judge Easterbrook so ably explains, the concepts are really two sides of the same coin:

> Defendants' only contention is that no one 'retaliated' against plaintiffs for testifying, because the insults, assaults, and threats all preceded plaintiffs' depositions in *Fields*. This misapprehends the nature of plaintiffs' claim. The Constitution prevents governmental actors from forbidding, or penalizing,

speech that is protected under the first amendment. Penalties that follow speech are forbidden. This includes, but certainly is not limited to, reactions to what has already been said. But threats of penalties also are forbidden. That's why it can be misleading to speak of "retaliation" as the basis of a suit. The word implies that threats don't matter, and the district court here was misled. . . .

The word 'retaliation' has the potential, realized here, to divert attention from the rule that both threats designed to deter future speech and penalties for past speech are forbidden.

*Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) (internal citations omitted). It follows that a public employer's punishment for protected speech can be both retaliation and a prior restraint. It can be retaliation because it penalizes past speech; it can be a prior restraint because the penalization of past speech can constitute a threatened penalty for similar future speech. The Court believes this to be true in the instant case: the adverse employment actions in question here may not only punish Braswell's past speech, but could also discourage him from speaking in the future. Accordingly, for the reasons material to Braswell's retaliation claim, the Individual Defendants are not entitled to qualified immunity on his First Amendment prior restraint claim.

### 4.  Braswell's ACRA Claim

The parties agree that ACRA claims premised on violations of the First Amendment are analyzed under the same rubric as First Amendment claims themselves. "ACRA claims undergo the same analysis [as First Amendment claims] because the free speech protections of the Arkansas Constitution are no more generous than those of the First Amendment." *Stoner v. Ark. Dep't of Correction*, 983 F. Supp. 2d 1074, 1099 (E.D. Ark. 2013) (citing *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855 (8th Cir. 2009)). Therefore, the Individual Defendants are not entitled to qualified immunity on Braswell's ACRA claim.

### 5.  Braswell's AWA Claim

The AWA provides that:

(a) **(1)** A public employer shall not take adverse action against a public employee because the public employee or a person authorized to act on behalf of the public employee communicates in good faith to an appropriate authority:

**(A)** The existence of waste of public funds, property, or manpower, including federal funds, property, or manpower administered or controlled by a public employer; or

**(B)** A violation or suspected violation of a law, rule, or regulation adopted under the law of this state or a political subdivision of the state.

Ark. Code Ann. § 21-1-603(a)(1). The parties dispute whether the meaning of "adverse action" in subsection (a)(1) is coextensive with the meaning of "adverse employment action" in the First Amendment context. While Defendants contend that the meaning is coextensive, Braswell believes that the Arkansas General Assembly has defined the term "adverse action" in a manner that makes it broader than its federal counterpart. *See* Ark. Code. Ann. § 21-1-602(1) ("'Adverse action' means to discharge, threaten, or otherwise discriminate or retaliate against a public employee *in any manner that affects the employee's employment*, including compensation, job location, rights, immunities, promotions, or privileges.") (emphasis added).

This, however, is a dispute that the Court need not decide at this time. Even assuming, *arguendo*, that the meanings are coextensive, the Individual Defendants are not entitled to qualified immunity for the reasons discussed above.

### C.  Summary Judgment: Municipal Liability

In addition to his claims against the Individual Defendants, Braswell also seeks to hold the County itself liable for his alleged damages. "Municipal liability under section

1983 is appropriate in cases where a municipal 'policy' or 'custom' causes the constitutional violation." *Doe v. Washington Cnty.*, 150 F.3d 920, 922 (8th Cir. 1998); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Although municipalities cannot be held liable for their employees' actions through a *respondeat superior* theory, *Monell*, 436 U.S. at 691, when an employee's "unconstitutional act can be characterized as execution of an established governmental policy or custom, the county is charged with the deprivation." *Sanders v. St. Louis Cnty.*, 724 F.2d 665, 667 (8th Cir. 1983) (citing *Monell*, 436 U.S. at 694).

Under this standard, Braswell can assert a claim for a constitutional violation against the County if he can show that the County "acted to inflict an injury through an official proclamation of the municipality's officers (officials whose edicts or acts represent official policy) or through custom" and that he incurred "constitutional injury." *Bechtel v. City of Belton, Mo.*, 250 F.3d 1157, 1160 (8th Cir. 2001). As an initial matter, Braswell satisfied the constitutional injury requirement by showing that he incurred an adverse employment action. *See id.* at 162 ("Bechtel fails to prove a constitutional injury because he cannot show that any action of Trivitt resulted in an adverse employment action against him."). Thus, the only remaining question is whether the County inflicted the constitutional injury through official policy or custom. The Court finds that there is a genuine issue of material fact as to whether it did.

As stated above, municipal liability can arise from a custom that causes a constitutional violation. While an isolated incident does not a custom make, *Sanders*, 724 F.2d at 667, Braswell has offered proof that several Department employees have faced retaliation from other employees and supervisors for exercising First Amendment rights.

*See Ware v. Jackson Cnty. Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) ("A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by . . . misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute a custom or usage with the force of law.'" (quoting *Monell*, 436 U.S. at 691)). For instance, David Williams, a Department employee, stated that a co-worker threatened to physically assault him in front of a supervisor for reporting violations of the Road Department's tobacco policy—a threat that went unpunished. (Doc. 38-2, p. 2). He also swore that he was retaliated against for being friendly with another employee who was transferred to a different crew after complaining about violations of the Road Department's foul language policy. *Id.* at ¶ 14. Finally, Williams identified four employees—including Braswell—who he believed were involuntarily transferred to a different crew as "a form of punishment or an attempt to force that employee to resign." *Id.* at ¶ 16.

Some of the alleged comments directed at Braswell while he was on the bridge crew also evince a custom of retaliation. Wagnon allegedly stated that "Brian used to sit right there and keep his mouth shut, and it only took three weeks to get him to quit," and that "[w]e got rid of Fred, and there's only two or three more . . . once we get rid of them, we will be in good shape." (Doc. 38-1, ¶ 10). These comments are further supported by Brad Robbins' testimony that Fred Davis and Brandon Holland were transferred to other crews in an effort to get them to quit. (Doc. 38-3, pp. 42-46). Robbins himself, moreover, stated that he was worried about being retaliated against for giving his deposition, and that his concern came from "past experiences and what's happened to other people

. . . ." *Id.* at 49. All of this would allow a reasonable juror to conclude that the County has a custom that caused Braswell's constitutional violation.

### D.  Summary Judgment: Outrage

Defendants end their Motion for Summary Judgment by arguing that Braswell has failed to establish the Arkansas state law tort of outrage as a matter of law. To establish the tort of outrage, a plaintiff must show:

(1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct;

(2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community;

(3) the defendant's actions were the cause of the plaintiff's distress; and

(4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Templeton v. United Parcel Serv., Inc.*, 364 Ark. 90, 96 (2005). The Arkansas Supreme Court has taken "a strict view in recognizing an outrage claim, particularly where it is alleged in employment relationships." *Id.* In fact, at least as of *Templeton*, the Arkansas Supreme Court has recognized an outrage claim in an employment context only once in its history. *Id.* The case, *Tandy Corp. v. Bone*, involved a particularly extreme set of facts—as a case must in order to warrant application of the outrage tort. 283 Ark. 399 (1984). As the *Templeton* Court summarized: Bone was an employee of Tandy Corp. who had a personality disorder that made him more susceptible to stress and fear than normal. 364 Ark. at 96. He was dependent upon a prescribed tranquilizer to control his symptoms. *Id.* at 97. Tandy Corp. suspected Bone of stealing, and directed two security officers and his manager to interrogate him for thirty-minute intervals throughout the day. *Id.* Bone requested access to his medication several times during the day, but his interrogators

denied it to him each time. *Id.* During the administration of a polygraph test, Bone began hyperventilating and ended up having to be hospitalized for a week. *Id.*

Defendants' conduct in the instant case and the indignities and harms incurred by Braswell simply do not rise to the extreme, outrageous, and severe levels illustrated by *Bone*. Instead, they are much more in line with the Arkansas Supreme Court cases rejecting an employee's outrage claim. *See Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941 (2002) (strained working relationships, deliberate attempt to undermine authority, false accusations of shoddy work, false accusations and rumors of mental illness did not rise to the level of outrage); *Smith v. Am. Greetings Corp.,* 304 Ark. 596 (1991) (dispute that ended with supervisor hitting employee, false allegation that employee provoked the fight, and subsequent termination of employee insufficient for the tort of outrage); *Sterling v. Upjohn Healthcare Serv., Inc.,* 299 Ark. 278 (1989) (unfounded assertions that plaintiff was drunk at work, attempts to undermine plaintiff, and violent rhetoric regarding the plaintiff did not give rise to outrage claim). Therefore, the Court agrees with Defendants and finds that Braswell's outrage claim cannot survive summary judgment.

## IV.     CONCLUSION

For the reasons stated herein, Braswell's Motion for Leave (Doc. 33) is **GRANTED**. Braswell shall file his Second Amended Complaint by no later than **MARCH 24, 2016**. Defendants' Answer shall be filed no later than **March 31, 2016**.  Defendants' Motion for Summary Judgment (Doc. 26) is **GRANTED IN PART AND DENIED IN PART**. The Motion is **GRANTED** with respect to Braswell's outrage claim. The Motion is **DENIED** with respect to all of Braswell's other claims.

**IT IS SO ORDERED** on this 23rd day of March, 2016.


/s/Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE